[No. 14966.  Department One.  December 4, 1918.]

NATIONAL BANK OF TACOMA, *Appellant,* v. PUGET SOUND LUMBER COMPANY, *Respondent.*[1]

ESTOPPEL (15, 35-39)—ELEMENTS OF EQUITABLE ESTOPPEL—APPARENT TITLE—SET-OFF—ASSIGNED ACCOUNT. Where a creditor of a logging company, by a written contract, purchased a raft of logs from its debtor, for "spot cash," without any reservation of its right to the logs or an accounting, appreciating the legal effect of the contract, which it may have made with mental reservations for the purpose of obtaining possession of the logs, and the debtor immediately sold the account to a bank holding its notes, the creditor is estopped to withhold the cash or plead a set-off as against the bank; since the doctrine of equitable estoppel applies as in the case of one who negligently causes another to rely on acts to its prejudice; notwithstanding the bank had knowledge of the previous situation of the parties to the sale, both of whom were liable on the notes held.

SAME. In such a case, attaching a draft for acceptance, not called for or mentioned in the contract, is not a suspicious circumstance calculated to put the buyer upon inquiry, as against the unqualified promise to pay cash.

[1]Reported in 176 Pac. 553.

SAME (63-65) — PLEADING — SUFFICIENCY OF ALLEGATIONS. The failure to plead an estoppel is not fatal, in view of Rem. Code, § 1752, requiring the disregard of technicalities and the considering of amendments as made, where both sides in fact relied upon an estoppel and both had set out the facts with the technical fault of omitting to state the legal conclusion of the estoppel; there having been a trial on the merits and no claim of surprise.

Appeal from a judgment of the superior court for Pierce county, Card, J., entered April 20, 1918, upon findings in favor of the defendant, dismissing an action on contract, tried to the court. Reversed.

*Hayden, Langhorne & Metzger,* for appellant.

*F. D. Oakley,* for respondent.

CHADWICK, J.—For some time prior to the times hereinafter referred to, the Upper Sound Logging Company had been engaged in the logging business. The company, finding itself in need of additional funds, applied to the Puget Sound Lumber Company for an accommodation of money. Respondent accordingly indorsed two promissory notes aggregating $10,500, which had been executed by the logging company and made payable to the appellant. In consideration of this accommodation, the logging company entered into a contract to sell to respondent, upon its request, all of the logs to be cut from a certain tract of land which it was then logging or had in contemplation for logging. The contract provided that, on all of the logs purchased by respondent, it was to retain $1.50 per thousand and pay it to the Traders Trust Company, which held a mortgage on the land. The remainder of the purchase price was to be applied upon appellant's notes, and in case the logs were sold to any party other than the respondent, the logging company agreed, nevertheless, to pay respondents the sum of $1.50 per thousand feet for all logs so sold, this amount

to be applied in the same way that the retained $1.50 would have been applied if the sale had been made direct to the respondent.

It was agreed that, after the mortgage held by the Traders Trust Company and the accommodation notes which had been executed in favor of the appellant were fully paid and satisfied, the respondent would pay to the logging company the full price of the logs as per a scale of prices therein agreed upon. The contract further provided for certain increases in the agreed price of logs, depending upon the market price of lumber at the time of delivery.

The logging company cut and sold to respondent 4,-270,320 feet, and 34,669 feet to a third party with the consent and knowledge of the respondent. It sold logs to the amount of 3,179,319 feet to other persons, firms and corporations without the knowledge or consent of respondent. Deliveries not being forthcoming in amount and quality as respondent thought they should, Mr. Wintermote, secretary of the respondent, went to Vaughn, where the logging operations were carried on. He there found a raft of merchantable logs consisting of 535,245 feet in the boom and ready for delivery. This the logging company had agreed to sell to the Puget Mill Company. Mr. Wintermote protested and claimed the right of his company to have delivery of the logs under the original contract. The logging company refused to so deliver, and after some oral negotiation, the parties executed the following writing:

"Tacoma, Washington, March 2, 1917.
"Messrs. Upper Sound Logging Company
    "Tacoma, Wash.
  "Gentlemen: Referring to our conversation of this day, we claim the raft of merchantable logs now rafted in your boom at Vaughn, and will send our tug for them today. We agree to pay you for this raft at

the rate of $9.50 per M for the merchantable and $6.25 per M for the No. 2 logs, usual premium for extra lengths, and we will pay you spot cash on delivery of the scale bill and invoice, less two % and also less interest on the amount for 10 days for 7%.

"Yours truly,
"Puget Sound Lumber Company.
"By E. V. Wintermote, Secy.-Treas."

"Referring to above letter, we will at once telephone our boom foreman to close the raft to include all merchantable logs now rafted and to add one section No. 2 logs should there not be 12 sections of merch.

"Upper Sound Logging Co.,
"(In duplicate)          By Kay Smith."

Indorsed on the written memoranda is the following:

"For value received the Upper Sound Logging Company hereby assigns the above agreement and the accounts attached hereto unto The Natl Bank of Tacoma.

"Upper Sound Logging Company,
"By John W. McFaddon, President."

There was attached to the contract an invoice for the raft of logs with the price $5,092.87. The logs were thereafter delivered to the respondent. The logging company took the memorandum and invoice, to which it had attached a draft for acceptance by the respondent, to the National Bank of Tacoma and there sold its account for its face value to the appellant.

The appellant brought suit on the contract evidenced by the memorandum. Respondent answered, setting up the facts as we have but briefly outlined them, and claimed damages in the sum of $1,940.17, by reason of the failure and refusal of the logging company to pay to respondent the sum of $1.50 per thousand on all of the logs which had been cut on the land described in the contract, and that it was further damaged in the sum of $3,179.31 by reason of the failure and refusal of the logging company to sell and deliver the

3,179,319 feet of logs which had been cut and delivered to third parties.

The trial judge made findings generally in favor of the respondent. He found an overwhelming amount due from the logging company to the respondent, and accordingly entered a judgment of dismissal against appellant.

The theory upon which the trial judge denied a recovery was that the plaintiff had full knowledge and notice of the original transaction and of the original contract at the time it was entered into, and at all times prior to the assignment of the account sued on, and that it was, therefore, in no position to assert a priority of claim as an assignee of the account.

The appellant was not a party to the original contract. It is a fair presumption of law and of fact that it accepted the notes, which had been signed by respondent for the accommodation of the logging company, upon the faith and credit of respondents' indorsement, but that would not make it a guarantor of the conduct of the logging company, nor would it prevent the logging company and the respondent from settling their differences by a subsequent contract. *Evans v. Oregon & Washington Co.*, 58 Wash. 429, 108 Pac. 1095, 28 L. R. A. (N. S.) 455.

If respondent was willing to waive its right to retain the purchase price, and to apply it, less $1.50 per thousand feet, on the debt to the bank, and for which it had become an accommodation indorser, the bank was at liberty to treat its subsequent contract as a commercial transaction. The agreement to withhold the price was for the benefit of respondent, and the appellant was in no sense a guarantor of the payment of the paper held by it. The fact that appellant knew of the original contract would aid its present position rather than defeat it, for, under the authority of the

case just cited, the contract of March 2 was evidence of "a new contract with the delinquent party."

At the time Mr. Wintermote went to the camp, he found the raft in the boom and ready for delivery to a third party, and it is in evidence that, but for the agreement which was reached between the parties, the raft would have been delivered to the Puget Mill Company and not to respondent. The cause, and the sole cause, for the agreement to deliver it to respondent, so far as we can see from the record, was that, for the particular raft of logs, the respondent was willing to pay "spot cash" upon delivery. It was within his power, and business prudence should have dictated to Mr. Wintermote, that he save his rights under the original contract by timely reference, if he then had it in mind to do so. The law will hardly permit one who, notwithstanding prior transactions or prior contracts, enters into a specific contract for the immediate delivery of a specific article to be paid for in a certain amount in "spot cash," with specific deductions or discounts (implying that there were no other adverse claims), to repudiate his promise, after an assignment of the account, and assert a right under a contract which, if it had been insisted upon at the time, would have avoided the present controversy. 34 Cyc. 750.

Respondent combats the equitable estoppel which arises *prima facie* against it upon several grounds: first, that the assertion, "We claim the raft of merchantable logs now rafted in your boom," is a sufficient declaration of an intention to claim under the original contract; second, that, in the negotiations had between the parties, it was not decided whether respondent would pay $2,000 cash upon delivery or whether it would accept a draft for the whole amount; and third, that it now transpires that the respondent

had been deceived and that it did not then know that the entire tract of land had been logged, and that the logging company had not paid the stipulated price of $1.50 per thousand to the bank on logs sold by it to third parties.

We are not concerned with the differences between the logging company and the respondent, but only with the right of the appellant to recover upon the contract made on the 2d day of March. In cases of this kind, the first question is whether the intent of the party sought to be charged to pay in any event can be reasonably inferred.

"Now, we take the rule to be well established that where a sale is made, and where the terms of the sale are cash, this, among merchants, is understood to mean cash on the delivery of the goods; that in the commercial world there is no difference and no distinction between a cash sale, or what is known as 'spot cash sale,' and a sale for cash on delivery. All of the evidence in this case shows, and in fact the proposition is indisputed, that this is what is known in commercial parlance as a 'spot cash sale'; that is, by the terms of the sale the vendee was to pay cash for the goods upon the delivery of the same." *McIver v. Williamson-Halsell-Frasier Co.,* 19 Okl. 454, 92 Pac. 170, 13 L. R. A. (N. S.) 696.

That Mr. Wintermote appreciated the legal effect of his contract and made it with reference to the conditions as he found them at the camp is quite certain, although it is only fair to say that he may have entertained some mental reservations and may have intended the contract of March 2d as a means of obtaining possession of the raft of logs, intending thereafter to assert his present claims against the payment of the money. Notwithstanding the positive character of the promise, he says:

"I sent Mr. Buchanan over there immediately after I signed this letter, and he 'phoned me after the first

visit not to pay it because they were not logging on this tract at all, but were logging on the Puget Timber Company land. I refused to pay the bill for this raft, and I notified them, too. The moving reason why I went over to where they were logging was to find out what the trouble was. I found out to my satisfaction. I found they were selling to parties other than us. After coming home, I signed this letter with the understanding that I have given you. I did not know what they wanted with that letter, only the assurance that we were to pay for these logs. I knew that our contract called for the payment of a certain price. Q. You said, if I understand you correctly, that, when you came back from there (referring to the camp of the Upper Sound Logging Company), you knew you were not getting all the logs they turned out. A. Yes, sure, I did. Q. You knew then, as a business man, that they were selling to somebody else? A. That is what I gleaned from it. Q. Yet in this letter under date of March 2, 1917, you say, 'We will pay you spot cash on delivery of the scale bill and invoice, less two per cent,' don't you? A. Yes, sir. Q. Now, what is the reason for that? A. I didn't get the chance. They never came to me. They slipped into the bank and cashed that letter. They didn't come to me at all. Q. You issued the letter then with knowledge on your part that they had been selling logs to third parties? A. Yes, sir. I will answer that yes, but I put this proviso to it when Mr. Smith brought me that letter, they were to go ahead and give me those logs under the contract. Q. Why didn't you put that in the letter? A. I don't know why I didn't, particularly; but Mr. Smith won't deny it."

Respondent knew, at the time the contract sued on was signed, that the logging company was claiming that it had not paid for a raft of logs previously delivered, that the logging company was insisting on a cash sale, and that it was hard up and in need of money. It knew that there had been some conversation about the time and manner of payment, yet it put forth a

writing which made no reservations and which might, and as it transpires did, pass in the customary channels of trade into the hands of a third party and for value. The principle governing has been heretofore declared by this court.

"Estoppel is an equitable proceeding, or speaking more accurately perhaps, it is the equitable result of a wrongful proceeding or act, a reliance upon which would, in the absence of an estoppel, work an injustice to an innocent person. At the common law estoppel was founded on deeds and records of courts, but estoppel in equity is estoppel *in pais*. The principle now applies because it has been found that the common law rule was too narrow and inadequate for the attainment of justice under the multiplied transactions of modern times, and hence the equitable estoppel of the present day. The well-understood idea of equitable estoppel is that, where a person wrongfully or negligently by his acts or representations causes another who has a right to rely upon such acts or representations to change his condition for the worse, the party making such representations shall not be allowed to plead their falsity for his own advantage." *Carruthers v. Whitney,* 56 Wash. 327, 105 Pac. 831, 134 Am. St. 1114.

And we may say of the defenses set up here, as was said in the case of *Fuller & Co. v. Longmire,* 97 Wash. 254, 166 Pac. 623: "We may observe that they relate in the most part to questions arising in the original [contract] action and not to questions arising between respondent and appellant."

Much is made in the briefs and in the oral argument over the fact that, at the time the bank bought the account, a draft was attached for acceptance, and that the agent of the logging company had called at the office of the respondent to have it accepted, and failing to find any one in authority, he had gone to the bank, and that the executive officer of the bank had

endeavored to reach respondent by telephone, and failing in this, had nevertheless purchased the account. But this, we think, is not sufficient to deprive appellant of its right to recover. The contract did not provide that the obligation of respondent should be further evidenced by the formality of a draft and acceptance. The contract being complete upon its face, the attachment of a draft by the seller was not a suspicious circumstance or one calculated to put a buyer upon inquiry. It certainly did not so operate as against the unqualified promise to pay in cash upon presentation of the scale bill and invoice.

Finally, respondent contends that the appellant cannot maintain its action, no estoppel having been plead in its reply. This case presents a singular aspect, in this: appellant sets up its cause of action, alleging that it had bought the account for value and in good faith and asked judgment. Respondent answered, admitting the execution of the contract, but denying that it had any knowledge or information sufficient to form a belief as to the truth of the allegation that plaintiff had bought for value and in good faith. It then proceeded to set up, in several separate affirmative defenses, its claims of damage against the logging company. Plaintiff replied, denying all of the allegations tending to support the claim of damages. The case went to trial, and the entire relationship of the several parties to the original contract, as well as the subsequent contract was gone into. During the course of the trial, counsel for appellant objected to all testimony concerning damages to the respondent arising out of its relationship to the logging company. The testimony went in generally without objection. It will thus be seen that both sides, in fact, relied upon an estoppel, the appellant contending that respondent is estopped to plead an offset as against its absolute

promise, and the respondent contending that the appellant is estopped because of its knowledge of the prior contract and its relation to the debt then owing by the logging company to the bank. The facts were pleaded on both sides, and each pleading has the technical fault of omitting to put in words the legal conclusion that the opposing party is, by reason of the facts, estopped to assert its claim.

We think the case falls within the rule of our statute, Rem. Code, § 1752, commanding us to hear and determine this case upon the merits, disregarding all technicalities and considering all amendments which could have been made as made. In this case it is not contended that there was any surprise, nor can it be contended that respondent was misled and, for that reason, prevented from presenting its case fully to the court. *Matzger v. Arcade Bldg. & Realty Co.*, 80 Wash. 401, 141 Pac. 900, L. R. A. 1915A 288; *Sjong v. Occidental Fish Co.*, 78 Wash. 4, 138 Pac. 313.

Notwithstanding the rule under the code, to which we have firmly adhered, that an estoppel to be available must be plead affirmatively, and the statute law to which we have referred, a like rule has been asserted in the absence of statute where it can be said that the estoppel inheres in the cause of action or in the defense. 8 Standard Ency. of Procedure, 689; *Bremen Sav. Bank v. Branch-Crookes Saw Co.*, 104 Mo. 425, 16 S. W. 209. So that, if it were not for our statute, the present contention of respondent could be overruled under the sanction of respectable authority.

The judgment is reversed, with directions to enter judgment in favor of appellant for the balance due upon the contract.

MAIN, C. J., TOLMAN, and MITCHELL, JJ., concur.